# UNITED STATES COURT OF APPEALS
## Tenth Circuit
## Byron White United States Courthouse
## 1823 Stout Street
## Denver, Colorado 80294
## (303) 844-3157

Patrick J. Fisher, Jr.                                      Elisabeth A. Shumaker
    Clerk                                                      Chief Deputy Clerk

January 13, 1999


**TO:** ALL RECIPIENTS OF THE OPINION

**RE:** 97-1149, <u>In re: Bayly Corp.</u>
Filed on December 22, 1998


The court's opinion filed in this matter on December 22, 1998, contains an incomplete citation. On page 13 of the slip opinion, line 5, the citation to <u>In re Sunarhauserman</u>, should appear as follows:

<u>In re Sunarhauserman</u>, 126 F.3d 811, 816-20 (6th Cir. 1997).

Please make the correction to your copy of the opinion.

Sincerely,
Patrick Fisher, Clerk of Court


Keith Nelson
Deputy Clerk

**F I L E D**
United States Court of Appeals
Tenth Circuit

**DEC 22 1998**

**PATRICK FISHER**
Clerk

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

BAYLY CORPORATION,
Tax ID No. 84-0014030,

     Debtor,

---

PENSION BENEFIT GUARANTY
CORPORATION,

     Appellant,

v.

CYNTHIA SKEEN, Trustee,

     Appellee.

No. 97-1149

---

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 95-N-901)**

---

Susan E. Birenbaum, Assistant General Counsel, Pension Benefit Guaranty
Corporation (Garth D. Wilson and Thomas T. Kim, Attorneys, Pension Benefit
Guaranty Corporation, James J. Keightley, General Counsel, Jeffrey B. Cohen,
Deputy General Counsel, and Israel Goldowitz, Assistant General Counsel,
Pension Benefit Guaranty Corporation, with her on the briefs), Washington, D.C.,
for appellant.

Christopher E. Bench, Bench & Associates, Denver, Colorado, for appellee.

---

Before **ANDERSON**, **EBEL** and **HENRY**, Circuit Judges.

**EBEL**, Circuit Judge.

After appellant Pension Benefit Guarantee Corporation ("PBGC") assumed control of the underfunded pension plan of the Bayly Corporation ("Debtor"), a bankrupt company, PBGC filed a proof of claim in bankruptcy court for the amount of the underfunding pursuant to 29 U.S.C. § 1362(b). PBGC sought priority for its claim under the Bankruptcy Code as an administrative expense. The bankruptcy court denied PBGC administrative expense priority and the district court affirmed the bankruptcy court. We affirm. Even though payment for the amount of underfunding did not become due and owing until the post-petition termination of the plan, PBGC's claim for unfunded benefit liabilities, predicated solely on benefits accrued by Debtor's employees as a result of pre-petition labor, represented a pre-petition claim contingent upon plan termination. Consequently, the liability was not incurred by the bankruptcy estate and did not qualify as an administrative expense under 11 U.S.C. § 503(b)(1)(B).

## BACKGROUND

On December 14, 1990, Debtor filed for bankruptcy in the District of Colorado under Chapter 11 of the Bankruptcy Code.[1] Because Debtor failed to

---

[1] The parties do not dispute the material facts of this case, having stipulated to most of the relevant facts.

reorganize, the bankruptcy court converted Debtor's case to a Chapter 7 liquidation on November 29, 1992. Appellee Cynthia Skeen was appointed successor Trustee on January 29, 1993.

Debtor had established the Defined Benefit Retirement Plan of Bayly Corporation (the "Plan") for its unionized employees in four western states, including Colorado. Employees covered by the Plan provided no services to Debtor after the bankruptcy case was filed. Under the Employee Retirement Income Security Act of 1974 ("ERISA"), sponsors of single-employer pension plans must make periodic contributions to their plans. See 26 U.S.C. § 412 and 29 U.S.C. § 1082. Plan sponsors also must pay premiums under the mandatory pension plan termination insurance program established under Title IV of ERISA. See 29 U.S.C. §§ 1301-1461; see generally PBGC V. LTV Corp., 496 U.S. 633, 636-39 (1990). Debtor qualified as a plan sponsor under ERISA.

PBGC, a wholly-owned United States government corporation, administers the pension plan termination insurance program. See 29 U.S.C. §§ 1301-1461. Under ERISA, PBGC becomes the statutory trustee of any plan terminated without sufficient funds to pay guaranteed benefits. See 29 U.S.C. §§ 1322, 1342, 1361. Upon termination of an underfunded plan, the plan sponsor incurs liability to PBGC for a mandatory termination payment to reimburse PBGC for the benefits PBGC must pay to the plan's beneficiaries. See 29 U.S.C. § 1362. In

such circumstances, PBGC has a claim against the plan sponsor for the total amount of the unfunded guaranteed benefits of the plan, subject to a limitation of thirty percent of the net worth of the employer. See 29 U.S.C. §§ 1342(d)(1)(B)(ii), 1362(b). If a liable employer fails to pay the amount of its liability under § 1362(b) after demand is made by PBGC, PBGC can establish a lien on all property of the liable party. See 29 U.S.C. § 1368(a). Such lien is to be treated in the same manner as a tax due and owing the United States under the Bankruptcy Code. See 29 U.S.C. § 1368(c)(2).

After Debtor filed for bankruptcy, PBGC and the Trustee executed an agreement terminating the Plan and appointing PBGC as the Plan's statutory trustee pursuant to 29 U.S.C. §§ 1342(a) and 1348(a)(3). The agreement established September 1, 1991 as the Plan's Termination Date. As of the Termination Date, the Plan had unfunded benefit liabilities of $1,097,800 and Debtor had a net worth of $1,175,789.37, and thirty percent of Debtor's net worth is $352,736.81.

PBGC then filed a proof of claim with the bankruptcy court for unfunded benefit liabilities under 29 U.S.C. § 1362(b) in the amount of $352,736.81, seeking administrative expense priority for its claim as a post-petition tax under 11 U.S.C. § 503(b)(1)(B)(I). The $352,736.81 figure represented 30 percent of Debtor's net worth, the largest amount PBGC could have asserted as a lien under

- 4 -

29 U.S.C. § 1368. However, because PBGC did not demand payment for the unfunded guaranteed benefit liabilities pre-petition and because an automatic stay had been issued by the bankruptcy court preventing any liens from ripening against Debtor post-petition, PBGC failed to create a lien against Debtor under 29 U.S.C. § 1368.[2] The Trustee objected to PBGC's claim, and the bankruptcy court held that PBGC was not entitled to administrative expense priority under the Bankruptcy Code. The district court affirmed. PBGC now appeals, arguing only that its $352,736.81 claim constitutes a post-petition tax under 11 U.S.C. § 503(b)(1)(B)(I) entitled to administrative expense priority.

## DISCUSSION

Section 507(a)(1) of the Bankruptcy Code grants first priority to certain administrative expenses listed in § 503, including "any tax–(I) incurred by the estate, except a tax of a kind specified in section 507(a)(8) of this title."[3] 11 U.S.C. § 507(a)(1); see also 11 U.S.C. § 503(b)(1)(B). In order to qualify for administrative expense priority as a tax under 11 U.S.C. § 503(b)(1)(B)(I),

---

[2] PBGC asserted $745,036.20, the balance of the $1,097,800 in total unfunded liabilities, as a general, unsecured claim under 29 U.S.C. § 1342(d)(1)(B)(ii). PBGC also sought payment of unpaid minimum funding contributions due under 29 U.S.C. §§ 1082 and 1362(c) and unpaid insurance premiums under 29 U.S.C. §§ 1306 and 1307. Those claims are not at issue on appeal.

[3] Neither party argues that PBGC's claim constitutes a tax listed in 11 U.S.C. § 507(a)(8).

PBGC's claim both must constitute a tax and must have been incurred by the estate post-petition.  See In re Sunnyside Coal Co., 146 F.3d 1273, 1278 (10th Cir. 1998) ("Only taxes 'incurred by the estate' are administrative expenses. . . . However, until the petition is filed, there can be no estate; hence 'first priority for tax claims extends only to post-petition taxes.'") (citing 4 Collier on Bankruptcy, ¶ 503.07[1] (15th ed. rev. 1998)).  In denying administrative expense priority, the bankruptcy court found that PBGC's claim for $352,736.81 failed to meet either of these two requirements.  We review de novo the district court's conclusions of law.  See State Bank v. Gledhill (In re Gledhill), 76 F.3d 1070, 1077 (10th Cir. 1996).  We need not decide whether PBGC's claim for unfunded benefit liabilities can properly be characterized as a tax claim because, in any event, we agree that PBGC's claim was not incurred by the estate post-petition.[4]

---

[4] We have embraced a functional analysis to decide whether particular payments may be deemed taxes.  See  In re Sunnyside Coal Co., 146 F.3d at 1276 (citing United States v. Dumler (In re Cassidy), 983 F.2d 161, 163 (10th Cir. 1992)).  This functional analysis considers four factors which address whether the payments are: (1) An involuntary pecuniary burden, regardless of name, laid upon the individuals or property; (2) Imposed by, or under authority of the legislature; (3) For public purposes, including the purposes of defraying expenses of government or undertakings authorized by it; and (4) Under the police or taxing power of the state. See In re Sunnyside Coal Co., 146 F.3d at 1276-77.

The real dispute over whether this contribution should be considered a tax focuses on factor three — whether ERISA contributions under 29 U.S.C. § 1362 are for a public purpose.  In In re Sunnyside Coal Co., we held that premiums assessed against a bankruptcy estate under the Coal Industry Retiree Health Benefit Act of 1992, 26 U.S.C. §§ 9701-9722, are "taxes" entitled to

(continued...)

We narrowly construe the priorities allowed under § 503(b) because "the presumption in bankruptcy cases is that the debtor's limited resources will be equally distributed among his creditors." Isaac v. Temex Energy, Inc. (In re Amarex, Inc.), 853 F.2d 1526, 1530 (10th Cir. 1988) (quoting Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc., 789 F.2d 98, 100 (2d Cir. 1986)). A

[4](...continued)
administrative priority. 146 F.3d at 1274. We explained that Coal Act contributions served a public purpose because their "purpose is to support the government in its effort to maintain stability in the coal industry." Id. at 1277. Arguably, if Coal Act contributions serve a public purpose because their "purpose is to support the government in its effort to maintain stability in the coal industry," then ERISA contributions under 29 U.S.C. § 1362 serve a public purpose because their purpose is to support the government in its effort to maintain pension stability. Contributions under 29 U.S.C. § 1362 support the government in its pension stabilization undertaking by defraying expenses of the government. PBGC, a wholly-owned United States government corporation, has its single-employer program funded by four sources, one of which includes 29 U.S.C. § 1362 contributions.

On the other hand, we note that in In re CF&I Fabricators of Utah, Inc., 150 F.3d 1293, 1297 (10th Cir. 1998) (In re CF&I Fabricators (II)), this court held that PBGC's claim for unpaid minimum funding contributions under 26 U.S.C. § 412(n)(1)(B) did not qualify as a tax under the Bankruptcy Code because the contributions served no public purpose. Id. at 1297-98. In re CF&I Fabricators (II) may be distinguishable because in In re CF&I Fabricators (II) PBGC admitted that the object of the contributions was not to defray government expenses, but rather, to finance a private obligation. Id. at 1298. Here, PBGC has made no such concession. Instead, in this case, PBGC argued that the object of contributions under 26 U.S.C. § 1362 is to defray expenses of government.

Given the tension between In re Sunnyside Coal Co. and In re CF&I Fabricators (II), we find it expeditious simply to assume without deciding that PBGC's claim for unfunded benefit liabilities can properly be characterized as a tax claim because we can affirm on the ground that PBGC's claims were not "incurred by the estate."

- 7 -

claim is not entitled to priority under § 503 "simply because the right to payment arises after the debtor in possession has begun managing the estate." <u>In re Amarex, Inc.</u>, 853 F.2d at 1530. If a debtor becomes liable to a claimant before the bankruptcy petition is filed, but the liability is contingent on the occurrence of some future event, the claim to recover that debt is treated as a pre-petition claim even if the condition does not occur and the right to payment does not arise until after the bankruptcy petition is filed. <u>Cf. id.</u> (inquiry must focus on what consideration supports the claim and whether it or any portion of it was pre-petition).

For example, a claim by a guarantor against a debtor to recover post-petition payments made by the guarantor on behalf of the debtor under the terms of a pre-petition guarantee agreement is treated as a pre-petition claim under 11 U.S.C. § 502(e)(2), which deals with the allowance and disallowance of contingent claims. <u>See</u> 4 <u>Collier on Bankruptcy</u>, ¶ 502.06[3]. The claim's pre-petition status remains undisturbed even if the guarantor pays the creditor post-petition:

> Such claims have the same priority as the underlying creditor's claim, and are not elevated in priority merely because the underlying creditor's claim was extinguished postpetition. To give a surety better than prepetition status because it made payment to a prepetition creditor after the filing of a bankruptcy petition would distort the scheme of the Bankruptcy Code with respect to prepetition claims and postpetition administrative expense claims.

Id. ¶ 502.06[3][a].

Courts have employed the same rationale in addressing the status of claims against employers for amounts due as a termination payment upon withdrawal from a multiemployer pension plan. Under the Multiemployer Pension Plan Amendments Act ("MPPAA"), 29 U.S.C. §§ 1381 et seq., an employer who participates in a multiemployer pension and employee benefit plan must make periodic funding payments to the plan to cover the cost of benefits for that employer's employees. If the employer subsequently withdraws from the multiemployer plan, the employer incurs a withdrawal liability. See 29 U.S.C. § 1381. The employer becomes obligated to make a lump sum payment of additional money to the plan upon withdrawal in order to satisfy the employers' proportionate share of the vested but unfunded benefits to be paid to employees participating in the plan. See Susan Block-Lieb, Priority Claims, Including Administrative Expense Claims, 546 PLI/Comm 697, 728-29 (1990) (citing cases). Courts have uniformly concluded that withdrawal liability based on benefits earned as a result of employees' pre-petition labor, even if incurred post-petition, is a pre-petition contingent liability under bankruptcy law. See, e.g., Trustees of Amalgamated, 789 F.3d at 103-04; see also Block-Lieb, supra, at 728-29. Thus, courts have denied priority as a post-petition administrative expense to withdrawal liability claims predicated on pre-petition benefit liabilities, despite

the fact that the withdrawal occurred post-petition. <u>See</u> <u>Trustees of Amalgamated</u>, 789 F.3d at 104 (citing cases).

Numerous other examples abound. First, claims for real estate taxes that accrue during the pre-petition tax year but that are not calculated or do not become payable until a post-petition date are still considered pre-petition claims. <u>See</u> <u>In re Mort Hall Acquisition, Inc.</u>, 181 B.R. 860, 864 (Bankr. S.D. Tex. 1994) (county had pre-petition unliquidated right to payment of ad valorem taxes on business personal property owned by debtor, contingent upon subsequent post-petition act of assessment); <u>see</u> <u>also</u> <u>In the Matter of Handy Andy Home Improvement Ctrs., Inc.</u>, 144 F.3d 1125 (7th Cir. 1998) (pro-rating claim for tenants obligation for real estate taxes between taxes that accrued on property during tenant's pre-petition and post-petition occupancy).

Second, income taxes on income earned during a taxable year prior to the commencement of bankruptcy proceedings constitute pre-petition claims, even though the taxes are not due and payable until post-petition. <u>See</u> <u>In the Matter of O.P.M. Leasing Servs., Inc.</u>, 68 B.R. 979, 983-85 (Bankr. S.D.N.Y. 1987) (any tax liability on income earned by the pre-petition debtor is not entitled to administrative expense priority); <u>cf.</u> <u>In re Pacific-Atlantic Trading Co.</u>, 64 F.3d at 1301 ("tax on income should be treated as 'incurred' on the last day of the taxable period").

Third, unemployment compensation taxes accrue pre-petition even though the liability for the taxes is not triggered until post-petition, where the taxes are predicated on the pre-petition work of debtor's employees and neither debtor nor trustee had any post-petition business operations. See In re Northeastern Ohio Gen. Hosp. Ass'n, 126 B.R. 513, 515 (Bankr. N.D. Ohio 1991).

Fourth, tax reimbursement claims are pre-petition where the agreement to pay existed pre-petition even though the tax obligation matured post-petition. See In re Ames Dep't Stores, Inc., 136 B.R. 353, 356 (Bankr. S.D.N.Y. 1992).

Similarly, this court in In re CF&I Fabricators (II) denied administrative priority to PBGC's claims against a plan sponsor for minimum funding contributions under ERISA based on the plan's liabilities for benefits accrued by employees as a result of pre-petition labor. 150 F.3d at 1298-1300. The court held that the liability constituted a contingent, pre-petition claim. See id. at 1299; see also In re Kent Plastics Corp., 183 B.R. 841, 846 (Bankr. S.D. Ind. 1995) (the obligation to pay minimum funding requirements under ERISA is a pre-petition debt "insofar as it relates to pre-petition labor by the debtor's employees").

The same approach applies to tax claims under § 503(b)(1)(B). "Although the Bankruptcy Code does not define the term 'incurred,' the Circuits addressing the issue have uniformly held a tax is incurred when it accrues." In re Sunnyside Coal Co., 146 F.3d at 1278. It is not sufficient that a tax merely becomes payable

post-petition in order to qualify as an administrative expense under § 503(b)(1)(B). See Towers v. United States (In re Pacific-Atlantic Trading Co.), 160 B.R. 136, 139 (N.D. Cal. 1993) (denying administrative expense priority for corporate income taxes where all "taxable activity occurred prior to [appointment of trustee] and was connected with the debtor company, not with the bankrupt estate," in which case awarding such priority would "subvert the intended purpose of Section 503."), aff'd in part, rev'd in part on other grounds, 64 F.3d 1292 (9th Cir. 1995); In re Northeastern Ohio Gen. Hosp. Ass'n, 126 at 514 (section 503(b)(1)(B) "has been interpreted to preclude administrative claim status for taxes not incurred in post-petition operation of a debtor's business."). By contrast, taxes that have been deemed to be post-petition include "taxes on capital gains from sales of property by the trustee and taxes on income earned by the estate." S. Rep. No. 95-989, at 66 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5852.

In this case, liabilities for benefits under the pension plan accrued as employees earned a vested right to those benefits as compensation for services rendered to their employer. See 4 Collier on Bankruptcy, ¶ 503.06[7][e]. Where the employees cease performing services for the employer before the employer files for bankruptcy, the amount of benefits due under a pension plan, and the employer's resulting liability for those benefits, become fixed pre-petition. Under

this rationale, the court in <u>In re Sunarhauserman</u>, 126 F.3d 811, 816-20 (6th Cir. 1997) held that PBGC's claim against the employer for minimum funding contributions to the pension plan predicated on pension benefits owed as a result of pre-petition labor by employees constituted a pre-petition obligation.

Here, all liabilities under the Plan stem from nonforfeitable benefits accrued by employees as a result of pre-petition labor. We find no reason to treat claims for plan termination liability any different than claims for withdrawal liability. The consideration supporting PBGC's claim is the same as that supporting the right to pension benefits itself, the past labor of Debtor's employees. Plan termination simply matured Debtor's pre-petition contingent liability to fund the Plan adequately. Thus, PBGC's claim is not entitled to administrative expense priority as a post-petition tax.

A situation almost identical to the case before us was addressed in <u>PBGC v. LTV Corp.</u> (<u>In re Chateaugay Corp.</u>), 87 B.R. 779 (S.D.N.Y. 1988), <u>aff'd on other grounds</u>, 875 F.2d 1008 (2d Cir. 1989), <u>rev'd on other grounds</u>, 496 U.S. 633 (1990). There, the court found that PBGC's right to payment of unfunded benefit liabilities at plan termination constituted:

> a classic example of a contingent claim–one which the debtor will be called upon to pay only upon the occurrence or happening of an extrinsic event. If the extrinsic event occurs post-petition, the contingent claim simply becomes a liquidated one; it, however, is not thereby elevated to the status of a post-petition claim. Here, the extrinsic event was plan termination, which simply fixed [debtor's] liability to PBGC.

Id. at 797 (internal quotations and citations omitted). The court analogized PBGC's claims for termination payments to claims for withdrawal liability for plan benefits earned through pre-petition employment, noting that courts uniformly consider such withdrawal liability to constitute a pre-petition claim. See id. at 798-99; see also In the Matter of United Merchants and Mfrs., Inc., 166 B.R. 234, 235-36 (Bankr. D. Del. 1994) ("Withdrawal liability [under ERISA] is the multiemployer plan equivalent of single-employer plan termination liability."). The court concluded that "PBGC has not offered a compelling reason why the post-petition termination of a pension plan should displace the actual service of employee-beneficiaries as the 'acts' that give rise to a sponsor's pension liabilities." In re Chateaugay Corp., 87 B.R. at 799.

Because the Supreme Court reversed the district court's decision in In re Chateaugay Corp. on other grounds and did not address the question at issue in this case, the Supreme Court's opinion did not undermine the persuasive value of the district court's holding. We note that even after the Supreme Court's opinion, several courts have continued to rely on the reasoning in In re Chateaugay Corp. regarding the pre-petition status of contingent liabilities. See Houbigant, Inc. v. ACB Mercantile, Inc. (In re Houbigant, Inc.), 188 B.R. 347, 355 (Bankr S.D.N.Y. 1995); In re Valley Steel Prods. Co., 142 B.R. 337, 342 (Bankr. E.D. Mo. 1992); Cohen v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert

Group, Inc.), 138 B.R. 687, 695 n.12 (Bankr. S.D.N.Y. 1992). We too find the reasoning in In re Chateaugay Corp. persuasive.

PBGC argues that clear language of ERISA requires a different result. Section 1362(a) provides that "any person who is, on the termination date, a contributing sponsor of the plan or a member of such contributing sponsor's controlled group shall incur liability" to PBGC in the amount of unfunded benefit liabilities. PBGC reads the statute to mean that liability under § 1362 only arises as of a plan's termination date. As a result, PBGC contends that its claim neither accrued nor was incurred by Debtor until the Termination Date, or post-petition.

However, although ERISA determines if PBGC has a claim for payment against a plan sponsor, the principles of bankruptcy law control as to when liability attaches.

> It is well established that the Bankruptcy Code, not ERISA, determines the priority of claims against a bankrupt estate. United States v. Embassy Restaurant, Inc., 359 U.S. 29 (1959) ('We construe the priority section of the Bankruptcy Act, not these statutes. It specifically fixes the priority of classes of creditors.'). Thus, regardless of the substantive law on which the claim is based, the proper standard for determining that claim's administrative priority looks to when the acts giving rise to a liability took place.

In re Sunarhauserman, 126 F.3d at 818; see also In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey, 160 B.R. 882, 892 (Bankr. S.D.N.Y. 1993) ("The time a claim arises is determined by bankruptcy law in the absence of an overriding nonbankruptcy federal policy or interest.").

- 15 -

Consequently, PBGC's contention that, because it had no right to collect the termination payment under ERISA prior to the bankruptcy petition filing date, its claim for payment is entitled to administrative priority, is unpersuasive. "All claims against the debtor, whether or not contingent or unliquidated, will be dealt with in the bankruptcy case." In the Matter of O.P.M. Leasing Servs., Inc., 68 B.R. at 984 (quotation and citation omitted); see also 11 U.S.C. § 104 (the definition of a claim covered by the bankruptcy case includes a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured."). Under the Bankruptcy Code, we find that PBGC's claim for unfunded benefit liabilities predicated on pre-petition employment represents a pre-petition contingent claim not entitled to administrative expense priority.

Therefore, we AFFIRM the district court judgment.